1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

STEPHANIE SHAW,                    )   CASE NO. CV 14-07955 MMM (FFMx)
                                   )
              Plaintiff,           )
                                   )
        vs.                        )   FINDING OF FACT AND CONCLUSIONS
                                   )   OF LAW
                                   )
LIFE INSURANCE COMPANY OF          )
NORTH AMERICA, a Pennsylvania      )
corporation; and DOES 1 through 10,)
inclusive                          )
                                   )
              Defendant.           )

        Plaintiff Stephanie Shaw filed this action on October 14, 2014, against Life Insurance Company

of North America ("LINA").[1]  Shaw alleges that she was denied long-term disability benefits to which

she was entitled under a disability benefit plan (the "Plan") established by her former employer, Colony

Advisors, LLC ("Colony Advisors").  After reviewing the administrative record and considering the

parties' trial briefs, the court makes the following findings of fact and conclusions of law.


                        **I.  FINDINGS OF FACT**

        **A.      The Plan**

1.      The Plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §

_____

        [1]Complaint, Docket No. 1 (Oct. 14, 2014).

1    1001 et seq. ("ERISA"), because it is an employee benefit plan funded by Shaw's employer.[2]

2    2.    Colony Advisors, LLC and U.S. Affiliates are the Plan Administrators.[3]

3    3.    Under the Plan, an employee is considered disabled and entitled to payments if, "solely because of Injury or Sickness, he or she is (1) unable to perform the material duties of his or her Regular Occupation; and (2) unable to earn 80% or more of his or her indexed earnings from working in his or her Regular Occupation."[4]  An employee's "Regular Occupation" is "[t]he occupation the Employee routinely performs at the time the Disability begins.  In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location."

4.    The Plan also provides that, "[a]fter Disability benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is: (1) unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and (2) unable to earn 60% or more of his or her Indexed Earnings."[5]

5.    In order to receive benefits, the employee must "provid[e] any information or documents needed to determine whether benefits are payable."[6]

6.    The Plan contains a mental illness limitation, under which LINA will pay a maximum of 24 months of benefits due to disability caused by: "(1) Anxiety disorders; (2) Delusional (paranoid) disorders; (3) Depressive disorders; (4) Eating disorders; (5) Mental illness; [or] (6) Somatoform disorders (psychosomatic illness)."[7]

---

[2]Administrative Record ("AR") at 1175.

[3]*Id.* at 1266.

[4]*Id.* at 1184.

[5]*Id.*

[6]*Id.* at 1193.

[7]*Id.* at 1191.

2

7.    The benefits that are payable to Class 2 employees until age 65 equal "[t]he lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit."[8]   Monthly disability benefits are calculated by deducting "Other Income Benefits" from "Gross Disability Benefits."[9]   "Other Income Benefits" include "any amounts paid because of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise, where a third party may be liable, regardless of whether liability is determined."[10]

**B.    Shaw's Employment**

8.    Shaw was employed as a legal assistant.[11]   Her responsibilities included "managing various company databases, tracking legal documents, and supporting the legal department in all capacities."[12]   Skills and attributes required for success as a legal assistant include  critical thinking; the ability to exercise good judgment in identifying problems, discrepancies and concerns; the ability to prioritize and multi-task to meet deadlines in an atmosphere with frequent interruptions; and high attention to detail.[13]

**C.    Onset of Shaw's Mental Illness**

9.    Shaw's disability claim is based on symptoms of mental illness that began or worsened after she was sexually assaulted by a supervisor at work.[14]   The situation was aggravated when she reported the incident to her employer's human resources department, and some co-workers ridiculed her about the assault.[15]

---

[8]*Id.* at 1184-85.

[9]*Id.* at 1189.

[10]*Id.*

[11]*Id.* at 669.

[12]*Id.*

[13]*Id.* at 669.

[14]See *id.* at 94, 464, 475, 1164.

[15]*Id.*

10.   Shaw stopped working as a legal assistant at Colony Advisors on or about April 11, 2012.[16]

D.   **Shaw's Medical Treatment**

11.   Shaw was treated by Dr. Maurice Levy, an internal medicine and family practice physician, from June 5, 2011 to October 1, 2013.  On April 24, 2012, he placed Shaw on Total Temporary Disability ("TTD") from April 30 to June 4, 2012.[17]  Thereafter, he repeatedly extended her disability status.[18]  His notes indicate that as a result of the incident at work, Shaw suffered severe anxiety, depression, sleeping problems, tachycardia, and headaches.[19]  On July 13, 2012, Dr. Levy observed that Shaw could not be placed in stressful situations.[20]

12.   Shaw was treated by Karen Bryan, a therapist, twenty-six times between April 12 and August 2, 2012.[21]  Bryan advised LINA that she had diagnosed Shaw with depression, and referred her to Dr. Gartin for eye movement desensitization and reprocessing therapy ("EMDR") to treat PTSD and depression.[22]  Ultimately, Shaw discontinued therapy with Bryan because therapy seemed to be too traumatizing at the time.[23]  She did not authorize Bryan to release her records to LINA.[24]

13.   Shaw was treated by Dr. Lana Milton, a psychiatrist, from May 2012 to January 2013.[25]  In their nearly monthly sessions, Dr. Milton observed that Shaw was emotional, tearful, depressed,

---

[16]*Id.* at 674-75.

[17]*Id.*

[18]*Id.* at 291, 293, 436, 438, 440, 441, 446, 447, 484.

[19]See, e.g., *id.* at 250-54.

[20]*Id.* at 435.

[21]*Id.* at 94.

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]*Id.* at 1073.

4

anxious, and irritable.[26]  She reported GAF scores ranging from 45-58,[27] with the lowest GAF of 45 on Shaw's first, May 16, 2012, visit.[28]

14.  Shaw continued her psychiatric treatment with psychiatrist Khristine Eroshevich, whom she saw from August 5 to September 30, 2013, and again on December 16, 2013.[29] Dr. Eroshevich noted severe anxiety, lack of sleep, headaches, and paranoia.[30]  She also noted that Shaw began to refuse psychiatric medication in August and September 2013, and instead requested referrals to alternative and holistic treatments, including EMDR therapy, acupuncture, and massage therapy.[31]  Dr. Eroshevich consistently opined that Shaw exhibited a depressed and anxious affect and thought process, but otherwise demonstrated normal levels of intellectual processing and other manifestations of normal functioning.[32]

15.  Shaw began treatment with Dr. Sandy Gartin, an EDMR therapist, in May 2012, but did not provide LINA with clinical records to review.[33]

**E.   Shaw's Disability Applications**

16.  On April 11, 2012, Shaw applied for California State Disability Insurance ("CADSI") benefits.[34]

---

[26]See, e.g., *id.* at 624-30, 1075-85.

[27]See, e.g., *id.* at 626, 1040.  The Global Assessment of Functioning ("GAF") is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living.

[28]*Id.* at 1040.

[29]*Id.* at 240-44, 313, 1055-58.

[30]*Id.* at 67-68, 241-44, 1058-60.

[31]*Id.* at 68, 313.

[32]See, e.g., *id.* at 245-48, 1052-53, 1059-60.

[33]*Id.* at 60, 101.

[34]*Id.* at 272.

5

In her application, Shaw stated that she was unable to walk or concentrate.[35]  Dr. Levy provided a certification stating that Shaw was unable to work, but provided no details regarding the tasks she was or was not able to perform.[36]  His request for continued benefits on January 16, 2013, stated that Shaw was emotionally unable to engage in social relationships or to concentrate on work.[37]  Based on Dr. Levy's certification and independent examinations by psychiatrist Dr. Davud O. Bedrub, internist Dr. Rocely Q. Ella-Tamayo, and psychiatrist Dr. Norma R. Aguilar, Shaw was approved for CADSI benefits from April 2012 to April 2013.[38]  Shaw did not submit any of Drs. Bedrub's, Ella-Tamayo's or Aguilar's records to LINA.

17.   On December 4, 2013, the Social Security Administration ("SSA") found that Shaw did not qualify for benefits because she was not disabled under SSA regulations.[39]

18.   In August 2013, Shaw submitted a claim for long term disability benefits to LINA.[40]  On her claim form, she asserted that she was unable to perform the duties of her occupation due to PTSD, anxiety, shortness of breath, and depression.[41]

**F.     LINA's Initial Review**

19.   On October 10 and 29, 2013, Behavior Health Specialist Cynthia Doyle reviewed Shaw's medical records and concluded that the "clinical information, frequency, intensity and modalities of treatment are inconsistent with a severe mental illness causing a global functional mental impairment."[42]  She based this conclusion on the fact that Dr. Levy did not "document the

---

[35]*Id.* at 271.

[36]*Id.* at 279-82.

[37]*Id.* at 433.

[38]*Id.* at 454-56, 655-57, 853.

[39]*Id.* at 459.

[40]*Id.* at 719, 1100.

[41]*Id.* at 94, 475, 1164.

[42]*Id.* at 53, 69.

frequency, intensity and duration of specific symptoms of depression and panic which are indicators of the severity of the mental conditions."[43]  Doyle also relied on the fact that Dr. Levy did not "identif[y] specific psychological or cognitive impairments" or "measure[d] deficits in cognitive functioning" as evidence that Shaw was incapable of working.[44]

20.   Dr. Carol Flippen, M.D., who is board certified in adult and forensic psychiatry, reviewed Shaw's claim on October 21 and 30, 2013.  She noted that Dr. Milton's records did not document the frequency, intensity, and duration of specific symptoms of PTSD, anxiety, or depression.[45]  She also noted that there were no diagnoses of functional mental impairment, nor any documented referral to acute and intensive treatment "consistent with management of severe symptoms of mental illness significantly affecting global functioning."[46]

21.   Dr. Flippen similarly found that Dr. Eroshevic's records did not support the existence of cognitive defects or "document symptoms of illness to a severity requiring referral [to] . . . [an intensive outpatient program], [partial hospitalization], or psychiatric hospitalization."[47]  Dr. Flippen ultimately opined that Dr. Eroshevic's records did not reflect that Shaw was suffering "severe symptoms of mental illness causing global functional mental impairments."[48]

22.   As for Dr. Levy's records, Dr. Flippen noted that they were brief, contained minimal clinical information, provided no measured clinical assessment of cognitive functioning, and did not document the frequency, intensity or duration of Shaw's symptoms of anxiety or depression.[49]

23.   Relying on Doyle's and Dr. Flippen's opinions, LINA informed that Shaw it was "unable to

---

[43]*Id.* at 53.

[44]*Id.*

[45]*Id.* at 60.

[46]*Id.*

[47]*Id.* at 59.

[48]*Id.*

[49]*Id.* at 43.

1    approve [her] claim for benefits" on November 1, 2013.[50]

2    **G.    Shaw's Appeal**

3    24.    On April 30, 2014, Shaw submitted an appeal, including a detailed, 32-page appeal letter.[51]  In

4    the letter, Shaw provided information concerning the impact her mental illness had had on her

5    daily life.  She stated, for example, that it was "impossible to perform the material duties of [her]

6    Regular Occupation at the level and skills required to perform consistently[, e.g., by exercising]

7    good judgment in identifying problems," because her "mental clarity [was] clearly suffering."[52]

8    She also asserted she "[could] [ ]not multi-task to meet deadlines in an atmosphere with frequent

9    interruptions" because she was "suffering from memory loss and a lack of focus and

10   concentration."  Finally, she reported that a "lack of motivation . . . explain[ed] why [she] would

11   be unable to show the strong work ethic and initiative necessary for [her] regular occupation as

12   a legal administrative assistant."[53]

13   25.    Shaw also submitted a narrative, which stated in part: "For me, functioning may appear to be

14   normal at times but it requires markedly increased effort by myself and as a result I experience

15   a great amount of anxiety which pains m[e] physically with headaches and stomach aches,

16   mentally with memory loss and confusion and emotionally with an increased lack of

17   motivation."[54]

18   26.    In support of her appeal, Shaw submitted letters from her family and friends (her ex-fiancé,

19   mother, father, sister, and a friend).  These individuals reported that she suffered from constant

20   anxiety, unpredictable depression and memory impairment, that her personal hygiene had

21

22

23   ────────────────

24   [50]*Id.* at 135-37.

25   [51]*Id.* at 686-717.

26   [52]*Id.* at 697.

27   [53]*Id.*

28   [54]*Id.* at 239.

1      declined, and that she often lacked the energy or motivation to conduct her daily activities.[55]

2   27.   On July 15, 2014, Dr. Daniel Harrop, M.D., who is board certified in psychiatry, completed a

3          peer review of Shaw's medical records.[56]  He concluded that the "medical evidence submitted

4          [was] not adequate to support any impairment" as the "severity of the symptoms noted" was not

5          corroborated by "clinical abnormalities in claimant's day-to-day routine due to her psychiatric

6          symptoms."[57]  He acknowledged that Shaw had experienced some "mild psychological distress,"

7          noting her GAF score of 58, but concluded that personal care, vocational, educational, social,

8          memory, cognition, and concentration problems were not supported by the records.[58]

9   28.   Relying on Dr. Harrop's findings, LINA upheld its decision to deny benefits in a July 30, 2014

10         letter.[59]

11      **H.      Shaw's Requests for Records**

12  29.   Shaw requested a copy of her claims file several times during the appeals process.  Her first

13         request was made on November 8, 2013.[60]   On December 5, 2013, in response to a

14         communication from Ellen Cohen, an attorney who represented Shaw in her suit against her

15         employer, LINA sent the claims file directly to Cohen.[61]  It stated: "Due to the sensitive nature

16         of the records, we are releasing these records to you.  Please do not release these records to

17         STEPHANIE SHAW."[62]

---

[55]*Id.* at 679-83.

[56]*Id.* at 174-77.

[57]*Id.* at 175.

[58]*Id.* at 176.

[59]*Id.* at 127-29.

[60]*Id.* at 386.

[61]*Id.* at 32, 134.

[62]*Id.* at 134.

30.   Shaw requested her claims file a second time on April 15, 2014,[63] and a third time on May 13, 2014.[64]  On May 13, 2014, LINA responded that "since your claim[s] file contains sensitive information such as mental health records, please provide the name and contact information for one of your providers and I will release the file copy directly to him/her."[65]  LINA reiterated this offer on June 4, 2014.[66]

31.   Shaw did not respond; instead, she requested the file again on August 13, 2014.[67]  LINA replied that the file would be ready in two to three weeks; it requested the name and contact information of one of Shaw's medical providers so that it could release the file directly to him or her.[68]  Shaw asked that LINA prepare the file and promised to sign an authorization that would allow LINA to release the records to her new attorney.[69]   On August 28, 2014, LINA sent Shaw an email stating that the file was ready; it asked for her attorney's name so that it could forward the file.[70]  LINA sent the claims file to the McKennon Law Group on September 5, 2014.[71]

## II.  CONCLUSIONS OF LAW

### A.      Standard of Review

32.   The court reviews challenges to an ERISA plan's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for

---

[63]*Id.* at 399.

[64]*Id.* at 366.

[65]*Id.* at 193, 367.

[66]*Id.* at 341.

[67]*Id.* at 190, 192.

[68]*Id.* at 189.

[69]*Id.*

[70]*Id.*

[71]*Id.* at 14, 126.

1    benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S.

2    101, 115 (1989).  Where such discretion is vested in the administrator, "a district court may

3    review the administrator's determinations only for an abuse of discretion." *Taft v. Equitable Life*

4    *Assurance Soc'y* , 9 F.3d 1469, 1471 n. 2 (9th Cir. 1994); see also *Nord v. Black & Decker*

5    *Disability Plan* , 356 F.3d 1008, 1010 (9th Cir. 2004) ("[W]here, as here, a plan administrator

6    has 'discretionary authority to determine eligibility for benefits,' we review the benefits decision

7    for abuse of discretion"), cert. denied, 125 S. Ct. 62 (2004).  The parties have stipulated that the

8    *de novo* standard of review applies.

9    33.    "[T]he District Court's 'de novo review of the parties' submissions' and resolution thereof, can

10         best be understood as essentially a bench trial 'on the papers' with the District Court acting as

11         the finder of fact." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003); see

12         also *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999) (holding, in an

13         ERISA disability benefits case, that "in its discretion, . . . the district court may try the case on

14         the record that the administrator had before it").

15   34.    When review is *de novo*, "the court does not give deference to the claim administrator's

16         decision, but rather determines in the first instance if the claimant has adequately established that

17         he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt. Inc.*, 623 F.3d

18         1290, 1295-96 (9th Cir. 2010).  See also *Polnicky v. Liberty Life Assurance Co. of Boston*, No.

19         13-CV-01478-SI, 2014 WL 6680725, *7 (N.D. Cal. Nov. 25, 2014) ("When conducting de novo

20         review of a decision by an ERISA plan administrator, the Court has a responsibility to undertake

21         an independent and thorough inspection of the decision"); *Armani v. Nw. Mut. Life Ins. Co.*, No.

22         CV 13-7058 RSWL (RZx), 2014 WL 7792524, *7 (C.D. Cal. Nov. 25, 2014) ("When . . . a court

23         must review the denial of benefits de novo[,] the court 'simply proceeds to evaluate whether the

24         plan administrator correctly or incorrectly denied benefits,'" quoting *Abatie v. Alta Health &*

25         *Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006)).

26   35.    "In a trial on the record, the court 'can evaluate the persuasiveness of conflicting testimony and

27         decide which is more likely true.'" *Armani*, 2014 WL 7792524 at *8 (quoting *Kearney*, 175

28         F.3d at 1095).  See also *Schramm v. CNA Fin. Corp. Insured Group Benefits Program*, 718

11

F.Supp.2d 1151, 1162 (N.D. Cal. 2010) (in reviewing the administrative record, "the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate").

36.   A plaintiff challenging a benefits decision under 29 U.S.C. § 1132(a)(1)(B) bears the burden of proving entitlement to benefits by a preponderance of the evidence. *Muniz*, 623 F.3d at 1294 ("As concluded by other circuit courts which have addressed the question, when the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant").  See also *Schwartz v. Metro. Life Ins. Co.*, 463 F.Supp.2d 971, 982 (D. Ariz. 2006) ("Plaintiff has the burden of proof to show that he was eligible for continued long term disability benefits based on the terms and conditions of the ERISA plan"); *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F.Supp.2d 1222, 1232 (N.D. Cal. 2003) ("The Court concludes that Plaintiff must carry the burden to prove that she was disabled under the meaning of the plan"); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F.Supp.2d 1145, 1155 (C.D. Cal. 1999)("[T]he burden in making such a claim [for entitlement to benefits] is on Plaintiff"); see also *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) ("A plaintiff suing under [29 U.S.C. § 1132(a)(1)(B)] bears the burden of proving his entitlement to contractual benefits"); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992) ("[W]e agree that it was [the claimant's] burden to show that he was entitled to the 'benefits . . . under the terms of his plan,'" quoting 29 U.S.C. § 1132(a)(1)(B) (omission original)).

**B.      The Parties' Requests for Consideration of Documents Not in the Administrative Record**

**1.      Legal Standard Governing Consideration of Documents Outside the Administrative Record**

37.   Whether a court can consider evidence outside the administrative record "depends on whether review is de novo . . . or for abuse of discretion. . . .  [C]ourts limit a district court to the administrative record when the court is reviewing a case on the merits for an abuse of discretion; consideration of new evidence is permitted only in conjunction with de novo review of a denial

of benefits." *Abatie*, 458 F.3d at 969; see also *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003) ("While under an abuse of discretion standard our review is limited to the record before the plan administrator, this limitation does not apply to de novo review").

38.     In *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938 (9th Cir. 1995), the Ninth Circuit joined the Third, Fourth, Seventh, Eighth, and Eleventh Circuits in "permit[ting] the admission, under carefully circumscribed conditions, of new evidence that was not part of the record before the plan administrator" when the district court is reviewing a denial of benefits *de novo*. *Id.* at 943; see also *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 731 n. 2 (9th Cir. 2006). In elaborating on the standard a district court should apply in exercising discretion to consider evidence not before the plan administrator, the *Mongeluzo* court quoted *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1025 (4th Cir. 1993):

"In our view, the most desirable approach to the proper scope of de novo review under ERISA is one which balances the [ ] multiple purposes of ERISA. Consequently, we adopt a scope of review that permits the district court in its discretion to allow evidence that was not before the plan administrator. The district court should exercise its discretion, however, only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision. In most cases, where additional evidence is not necessary for adequate review of the benefits decision, the district court should only look at the evidence that was before the plan administrator . . . at the time of the determination." *Id.* at 943-44 (alteration original).

39.     The *Mongeluzo* court emphasized, however, that "a district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator." *Id.* at 944; see also *Quesinberry*, 987 F.2d at 1027 ("[I]f the evidence is cumulative of what was presented to the plan administrator, or is simply better evidence than the claimant mustered for the claim review, then its admission is not necessary"); *Thomas v. Continental Cas. Co.*, 7 F.Supp.2d 1048, 1056 (C.D. Cal. 1998) ("In every case there

13

1    will always be relevant evidence that is not part of the administrative record. . . . *Mongezulo* was
2    concerned that the purposes of ERISA would be frustrated by courts conducting extensive
3    fact-finding in routine cases").

4  40.   Thus, "'in most cases,' only the evidence that was before the plan administrator should be
5        considered." *Kearney*, 175 F.3d at 1084 (citing *Mongeluzo*, 46 F.3d at 944).  See also *Polnicky*,
6        2014 WL 6680725 at *7 ("In reviewing the plan administrator's decision, the Court has
7        discretion to allow evidence that was not before the plan administrator, but 'only when
8        circumstances clearly establish that additional evidence is necessary to conduct an adequate de
9        novo review of the benefit decision,'" quoting *Mongeluzo*, 46 F.3d at 944; *White v. Coblentz,
10       Patch & Bass LLP Long Term Disability Ins. Plan*, No. C 10-1855 BZ, 2011 WL 2531193, *1
11       (N.D. Cal. June 24, 2011)("Generally, the court's review is limited to the evidence contained
12       in the administrative record and extrinsic evidence can only be considered under certain limited
13       circumstances").

14 41.   In *Opeta v. Northwest Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1218 (9th
15       Cir. 2007), the court, applying *Monteluzo*, cited *Quesinberry*'s "non-exhaustive list of
16       exceptional circumstances" in which the consideration of additional evidence may be necessary:
17       "claims that require consideration of complex medical questions or issues regarding the
18       credibility of medical experts; the availability of very limited administrative review
19       procedures with little or no evidentiary record; the necessity of evidence regarding
20       interpretation of the terms of the plan rather than specific historical facts; instances
21       where the payor and the administrator are the same entity and the court is concerned
22       about impartiality; claims which would have been insurance contract claims prior to
23       ERISA; and circumstances in which there is additional evidence that the claimant could
24       not have presented in the administrative process."

25                     **2.    LINA's Request for Judicial Notice**

26 42.   LINA requests the court take judicial notice of (1) the civil Complaint in *Stephanie Shaw v.
27       Colony Advisors, LLC*, et al., Los Angeles Superior Court Case No. BC500153, filed January

28

30, 2013;[72] and (2) the Confidential Separation Agreement and General Release, which memorializes the parties' settlement in that case.[73]

43. Shaw objects to both requests on multiple grounds. She asserts first that the documents are not part of the administrative record and thus should not be considered. As noted, however, when the court is conducting a *de novo* review, it has discretion to review information not in the administrative record. Under *Opeta*, a court can consider "additional evidence that the claimant could not have presented in the administrative process." *Opeta*, 484 F.3d at 1218. Although Shaw *could* have submitted the settlement agreement during the appeals process, because she settled her claim against her employer on November 5, 2013 and did not appeal LINA's decision until April 30, 2014, she had no reason to do so, as her claim had been denied at that point and the amount of any benefits she might have received was not at issue. Similarly, LINA, which had denied benefits, had no reason to investigate whether there was other income that should have been used to offset the amount of any benefits paid, because it was not paying benefits. Effectively, therefore, although either party in an absolute sense *could* have submitted the complaint and settlement agreement for inclusion in the administrative record, the documents were irrelevant to the issue under review and thus neither *would* have done so. Thus, although somewhat different than the situation posited by the *Opeta* court, where additional evidence could not have presented in an absolute sense, under the particular facts of this case, the court concludes that it would not be inappropriate to consider the documents if and when it determines that Shaw has carried her burden of proving entitlement to benefits by a preponderance of the evidence. The court, however, is not at that point. See, e.g., *Kaus-Rogers v. Unum Life Ins. Co. of America*, No. 01-CV-709S, 2004 WL 1166640, *5 n. 6 (W.D.N.Y. Apr. 4, 2004) ("Plaintiff also seeks to introduce evidence [outside the administrative record] related to the calculation of her benefits. . . .  However, that evidence is not relevant to this Court's review of Defendant's

---

[72]Complaint, Defendant's Request for Judicial Notice ("RJN"), Exh. 1, Docket No. 22-2 (Aug. 17, 2015) at 3.

[73]Confidential Separation Agreement and General Release, Docket No. 34-1 (Sept. 21, 2015).

decision to terminate benefits. Such evidence, if it is relevant at all, is only relevant with respect to the issue of damages (an issue not currently before this Court)"). The court thus declines to expand the administrative record to consider the complaint and settlement agreement in Shaw's suit against her employer at the present time. This ruling is without prejudice to LINA's right to have the court consider the evidence if it reaches the question of damages in future proceedings.[74]

### 3.  Shaw's Declaration

44.  Shaw asks the court to consider a declaration she has submitted that was not included in the administrative record.[75]

45.  The second paragraph of the declaration notes her request to therapist Karen Bryan that she be brief when speaking with LINA and states that she did not make the request because she sought to hide information detrimental to her claim, but because she viewed LINA with anxiety, distrust and paranoia during the claims review process.[76]  Whatever Shaw's motives, Bryan's analysis was not included in the administrative record and was not considered by LINA. Similarly, the information is not before the court and cannot be considered in conducting a *de novo* review. See *Kearney*, 175 F.3d at 1091 (9th Cir. 1999) ("The district judge exercised his discretion to limit review to the evidence that was before the administrator for two reasons, that Mr. Kearney could as easily have submitted this material to Standard, and that the court did not need it to conduct an adequate de novo review").

46.  The third paragraph of the declaration states: "The appeal letter that I prepared and sent to LINA took me between three and four weeks to prepare, because the effort needed to gather[ ] the documents and make arguments to convince LINA that I was disabled was extremely stressful and made me even more anxious and depressed. I often had to stop and start working on the

---

[74]Because it reaches this conclusion, the court need not address Shaw's various objections to the documents under the Federal Rules of Evidence. Shaw may raise the objections again if LINA renews its request that the court consider the complaint and settlement agreement at some future time.

[75]See Declaration of Stephanie Shaw ("Shaw Decl."), Docket No 28-1 (Sept. 8, 2015).

[76]*Id.*, ¶ 2.

1    document many times a day.  Other days I could not bring myself to work on the letter at all."[77]

2    47.    This portion of the declaration responds directly to LINA's post-denial argument that Shaw

3    could not have been functionally disabled if she was able to assemble as well-reasoned and

4    lengthy an appeal letter as she did.  LINA nonetheless objects that the court should not consider

5    this statement because it was not included in the administrative record.  The court has discretion

6    to admit this paragraph under *Opeta* because, at the time Shaw submitted her appeal, LINA had

7    not made the argument – indeed, it had not seen her appeal letter – and there was no reason for

8    her to provide information concerning the difficulty she had preparing it.  Nonetheless, the

9    evidence is not "necessary to conduct an adequate *de novo* review of the benefit decision," as

10   it merely responds to an argument by LINA the court finds unavailing, and does not provide

11   further information regarding Shaw's condition or ability to perform the material duties of her

12   employment.  See *Mongeluzo*, 46 F.3d at 944.  The court therefore declines to consider Shaw's

13   declaration.

14           **4.    Whether the Court Should Take Judicial Notice of the Diagnostic &**

15                   **Statistical Manual of Mental Disorders**

16   48.    Both parties' briefs, as well as Dr. Milton's reports, reference the Global Assessment of

17   Functioning ("GAF") numeric scale found in the Diagnostic & Statistical Manual of Mental

18   Disorders IV ("DSM-IV").  The DSM-IV is a proper subject of judicial notice.  See *Hoffman v.*

19   *Life Ins. Co. of N. Am.*, No. EDCV 13-2011-JGB, 2014 WL 7525482, *6 (C.D. Cal. Dec. 29,

20   2014) ("[T]he Court grants the RJN and takes judicial notice of the two versions of the DSM");

21   *Guzman v. Lamarque*, No. CIVS04-0700FCD GGHP, 2009 WL 900729, *11 (E.D. Cal. Mar.

22   31, 2009), report and recommendation adopted, No. CIVS040700FCD GGHP, 2009 WL

23   1110588 (E.D. Cal. Apr. 24, 2009) ("This court takes judicial notice of the DSM IV.

24   Fed.R.Evid. 201(b) permits courts to take judicial notice of a fact 'not subject to reasonable

25   dispute' either because it is (1) generally known . . . or (2) 'capable of accurate and ready

26   determination by resort to sources whose accuracy cannot be reasonably questioned'"), aff'd,

27   _____

28   [77]*Id.*, ¶ 3.

1     378 Fed. Appx. 762 (9th Cir. May 13, 2010) (Unpub. Disp.); *Martinez v. Pac. Gas & Elec. Co.*

2     *Long Term Disability Plan*, No. 1:05CV00931OWW DLB, 2006 WL 3349565, *5 (E.D. Cal.

3     Nov. 17, 2006) ("The request for judicial notice of the inclusion of bi-polar disorder in DSM-IV

4     is GRANTED"); see also *United States v. Cantu*, 12 F.3d 1506, 1509 n. 1 (9th Cir. 1993) (taking

5     judicial notice of the contents of the DSM). The court therefore takes judicial notice of the GAF

6     scale found in the DSM-IV.

7     **C.      Whether Shaw Was Entitled to Benefits**

8   49.   Under the policy, Shaw was required to provide "satisfactory proof" that solely because of injury

9     or sickness, she was unable to perform the material duties of her regular occupation. She was

10     also required to provide "any information or documents needed to determine whether benefits

11     [were] payable."[78] The policy does not define "satisfactory proof," nor does it indicate the types

12     of evidence required to support a disability claim based on mental illness.

13   50.   LINA argues that "satisfactory proof" involves not just diagnoses, but also objective medical

14     testing supporting the assertion that Shaw's medical condition prevents her from performing her

15     regular occupation. Shaw counters that the plan does not explicitly require that she produce

16     objective evidence or the results of particular medical tests as evidence of disability, and that her

17     claim cannot be denied on this basis. See *White*, 2011 WL 2531193 at *5 ("Courts in this District

18     have previously held that insurer defendants in ERISA actions cannot deny claims based on

19     standards that are not contained in the policy"); *Duncan v. Continental Casualty Co.*, No. C-96-

20     2421 SI, 1997 WL 88374, *4 (N.D. Cal. Feb. 10, 1997) (holding that the defendant insurer could

21     not deny a claim for benefits due to lack of objective medical evidence unless the requirement

22     that such evidence be submitted was clearly articulated in the policy). Thus, to determine

23     whether Shaw has met her burden of proof under the terms of the Plan, the court first examines

24     what the Plan requires.

25

26

27

28     [78]*Id.* 1188, 1193.

1          **1.    Legal Standard Governing Interpretation of the Plan and Nature of Medical**
2                  **Evidence That Must Be Submitted**

3    51.   "ERISA does not contain a body of contract law to govern the interpretation and enforcement

4          of employee benefit plans. . . .  Rather, Congress intended that courts apply contract principles

5          derived from state law but be guided by the policies expressed in ERISA and other federal labor

6          laws." *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997).

7          See also *Polnicky*, 2014 WL 6680725 at *7  ("When construing terms of the Plan, the Court

8          must 'apply contract principles derived from state law . . . guided by the policies expressed in

9          ERISA and other federal labor laws,'" quoting *Dupree v. Holman Professional Counseling*

10         *Centers*, 572 F.3d 1094, 1097 (9th Cir. 2009)).

11   52.   The terms of an ERISA plan should therefore be interpreted "in an ordinary and popular sense,"

12         as would be understood by a person of "average intelligence and experience." *Evans v. Safeco*

13         *Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990) (quoting *Allstate Ins. Co. v. Ellison*, 757 F.2d

14         1042, 1044 (9th Cir. 1985)).  "When disputes arise as to the meaning of one or more terms, we

15         first look to the explicit language of the agreement to determine the clear intent of the parties."

16         *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000); see also *Ingram v. Martin*

17         *Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1113 (9th Cir. 2001) (examining

18         the language of an ERISA plan first to determine whether its terms were unambiguous).  Further,

19         "[i]n California and in virtually every other jurisdiction in the country, ambiguities in insurance

20         contracts must be construed against the insurer.  This rule, known as the doctrine of contra

21         proferentem, extends to ERISA policies." *Polnicky*, 2014 WL 6680725 at *7 (citing *Lang v.*

22         *LTD Benefit Plan*, 125 F.3d 794, 799 (9th Cir. 1997) (in turn citing *Kunin v. Benefit Trust Life*

23         *Ins. Co.*, 910 F.2d 534, 539 (9th Cir. 1990)).

24   53.   Phrases such as "satisfactory proof" "have been used in insurance policies for at least a century.

25         . . .  The word 'satisfactory' is traditionally limited by an objective standard, so that the

26         insurance company is not permitted to reject proof that would be satisfactory to a reasonable

27         person. . . .  Thus 'satisfactory written proof that you have become disabled' means 'proof that

28         would be satisfactory to a reasonable person that you have become disabled.'" *Kearney*, 175

19

F.3d at 1089 (citing Charles R. Elliott, A TREATISE ON THE LAW OF INSURANCE 319 (1907); William R. Vance, HANDBOOK ON THE LAW OF INSURANCE 897 (Buist M. Anderson ed., 3d ed. 1951) (1904); 13A COUCH ON INSURANCE § 49A:27 (2d ed. rev. 1982); 3 INSURANCE LAW AND PRACTICE § 1443 (John Alan & Jean Appleman, rev. ed. 1967)).   See also *Conway v. Reliance Standard Life Ins. Co.*, 34 F.Supp.3d 727, 734 (E.D. Mich. 2014) ("The Fourth Circuit has interpreted the meaning of the term satisfactory proof not to require objective medical evidence per se, but rather proof that is 'objectively satisfactory'").

54.   Courts have concluded that it is unreasonable to reject "a claimant's self-reported evidence where the plan administrator has no basis for believing it is unreliable, and where the ERISA plan does not limit proof to 'objective' evidence." *James v. Liberty Life Assur. Co. of Boston*, 984 F.Supp.2d 730, 739 (W.D. Mich. 2013), aff'd, 582 Fed. Appx. 581 (6th Cir. Sept. 4, 2014) (Unpub. Disp.); see also *Ondersma v. Metro. Life Ins. Co.*, No. C-06-0258 MMC, 2007 WL 4371422, *3 n. 6 (N.D. Cal. Dec. 12, 2007) (considering the answers of plaintiff's husband on an SSA questionnaire that "confirm[ed] plaintiff's subjective symptoms and their impact on her ability to function").   "Similarly, [courts] have held it unreasonable to reject Plaintiff's treating/examining physician's notes of Plaintiff's self-reporting and subjective observations, or other assertedly 'subjective' evidence, where, as here, . . . the applicable Plan does not restrict the type of evidence that may be used to demonstrate disability." *Schwarzwaelder v. Merrill Lynch & Co.*, 606 F.Supp.2d 546, 563 (W.D. Pa. 2009).

55.   "At the same time, the prospect of receiving disability benefits based on an ailment whose extent is objectively unverifiable provides a strong incentive to falsify or exaggerate . . . [;] assessment of the claimant's credibility thus becomes exceptionally important" in such cases.   *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989).  See also *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers such as AIG must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)"); *Martucci v. Hartford Life Ins. Co*, 863 F.Supp.2d 269, 278 (S.D.N.Y. 2012) ("To force administrators to accept the subjective self-assessment of employees at face value, would invite

1    fraud and abuse upon the claims administration process").

2    56.    Where a plan requires that a claimant provide "satisfactory proof" of disability, she must proffer

3           evidence not only that she has a relevant diagnosis, but also that the illness or injury precludes

4           her from performing the tasks required by her regular occupation.  Accord *Seitles v. UNUM*

5           *Provident*, No. CIV S-04-2725 FCD DAD, 2009 WL 3162219, *8 (E.D. Cal. Sept. 29, 2009)

6           ("The Ninth Circuit has recognized repeatedly that merely because a person has a true medical

7           diagnosis does not by itself establish disability" (internal modifications and quotation marks

8           omitted)); see also *Jordan*, 370 F.3d at 880 ("That a person has a true medical diagnosis does

9           not by itself establish disability"); *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264,

10          275 (4th Cir. 2002) ("[W]e conclude that Gallagher has not submitted objectively satisfactory

11          evidence that he was unable to perform each and every material duty of his occupation during

12          the elimination period"); *Conway*, 34 F.Supp.3d at 734 ("Though there is medical evidence

13          showing that Plaintiff has experienced significant hearing loss, a loss of balance, and tinnitus,

14          the record does not show by objectively satisfactory evidence that these conditions rendered

15          Plaintiff unable to perform any of the material duties of his occupation as an attorney").

16          **2.     Legal Standard Governing Credibility of Physicians' Opinions**

17   57.    The credibility of physicians' opinions turns not only on whether they report subjective

18          complaints or objective medical evidence of disability, but on (1) the extent of the patient's

19          treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the

20          doctor provides supporting his or her conclusions.  *Williams v. United of Omaha Life Ins. Co.*,

21          No. CV-11-BE-3948-S, 2013 WL 5519525, *12 (N.D. Ala. Sept. 30, 2013) ("While the Supreme

22          Court held that ERISA administrators are not required to defer to treating physicians over

23          reviewing physicians, the district court handling ERISA appeals may evaluate the weight of each

24          doctor's opinion based on the extent of the patient treatment history, the doctor's specialization

25          or lack thereof, etc."). Cf. *Karanda v. Conn. Gen. Life Ins. Co.*, 158 F.Supp.2d 192, 205 n. 8 (D.

26          Conn. 2000) (stating that the credibility of a physician's opinion regarding eligibility for social

27          security benefits depends on "(i) the frequency of examination and the length, nature, and extent

28          of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's

21

1  consistency with the record as a whole; (iv) whether the opinion is from a specialist; [and] (v)

2  other relevant factors" (internal quotations marks omitted)).

3  58.  Shaw asks the court to give significant weight to the opinions of her treating physicians,

4  particularly Dr. Levy.  Courts have typically afforded greater weight to the opinions of

5  physicians who have treated the claimant for an allegedly disabling condition for a long period

6  of time.  See, e.g., *Kibel v. Aetna Life Ins. Co.*, No. CV 14-3861 SVW PLA, 2015 WL 858751,

7  *7 (C.D. Cal. Feb. 26, 2015) ("The record's great constant is Dr. Andersson: he was a

8  board-certified neurologist that treated Ms. Kibel from her disease's inception, including

9  numerous in-person examinations. Thus, his reports are very credible"); *Hodjati v. Aetna Life

10  Ins.*, CV 13-05021 SVW, 2014 WL 7466977, *14 (C.D. Cal. Dec.29, 2014) (crediting the

11  opinion of a treating physician over contradictory evidence offered by plaintiff); *Oldoerp v.

12  Wells Fargo & Company Long Term Disability Plan*, 12 F.Supp.3d 1237, 1255 (N.D. Cal. 2014)

13  ("when an in-person medical examination credibly contradicts a paper-only review conducted

14  by a professional who has never examined the claimant, the in-person review may render more

15  credible conclusions"); see also *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666,

16  676 (9th Cir. 2011) (ascribing more weight to the opinions of physicians who personally

17  examined the patient and described plaintiff's inability to work in great detail).

18  59.  "The assumption that the opinions of a treating physician warrant greater credit than the opinions

19  of plan consultants may make scant sense[, however,] when, for example, the relationship

20  between the claimant and the treating physician has been of short duration, or when a specialist

21  engaged by the plan has expertise the treating physician lacks." *Black & Decker Disability Plan

22  v. Nord*, 538 U.S. 822, 832 (2003).  "[I]f a consultant engaged by a plan may have an 'incentive'

23  to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding

24  of 'disabled.'"  *Id.*  See also *Hoffman*, 2014 WL 7525482 at *10.  A treating physician's report

25  is particularly unreliable "where the physician's records do not adequately support a specific

26  diagnosis." *Id.*

27  60.  Under such circumstances, a paper review by a physician retained by the plan administrator may

28  be more reliable than the opinion of a treating physician.  See *Hernandez-Medina v. Triple-S

22

1    *Vida, Inc.*, No. 11-1776, 2012 WL 6016734, *4 (D.P.R. Nov. 30, 2012) (upholding a denial of

2    benefits where two medical experts who did not examine plaintiff found "that there was

3    relatively little evidence in the record supporting a medically impairing condition that would

4    substantiate Plaintiff's inability to perform the duties of her occupation"); see also *Davis v.*

5    *Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006) ("In such [paper] file reviews,

6    doctors are able to fully evaluate medical information, balance the objective data against the

7    subjective opinions of the treating physicians, and render an expert opinion without direct

8    consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments

9    of the file and to save the plan the financial burden of conducting repetitive tests and

10   examinations").

11   61.   Courts also consider the physicians' areas of specialty, giving more weight to those doctors

12         whose specialty relates to the alleged disability.  See *Ondersma*, 2007 WL 4371422 at *8

13         ("Finally, as noted, Dr. Dixit, plaintiff's treating physician, has experience treating patients with

14         fibromyalgia, whereas the record is silent as to whether Dr. Lumpkins, or any of the other five

15         reviewing physicians has experience evaluating patients with fibromyalgia. Dr. Dixit's

16         experience provides an additional reason why Dr. Dixit's opinion is entitled to more weight than

17         those of the reviewing physicians").  See also *Broyles v. A.U.L. Corp. Long-Term Disability Ins.*

18         *Plan*, No. C-07-5305 MMC, 2009 WL 3817935, *6 (N.D. Cal. Nov. 12, 2009) ("It constitutes

19         an abuse of discretion for an administrator to rely on the opinion of a physician who has no

20         expertise in the relevant field"), aff'd, 408 Fed. Appx. 67 (9th Cir. Jan. 7, 2011) (Unpub. Disp.);

21         *Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1122-23 (9th Cir. 1998) (holding that an

22         administrator erred in denying benefits where plaintiff's disability claim was based on an eye

23         injury and it relied on the opinion of a physician who was not ophthalmologist).

24   62.   Finally, and most relevant here, the more detail a physician provides concerning the bases for

25         his or her diagnosis and opinion, the more weight his or her conclusions are afforded.  See, e.g.,

26         *Carrier v. Aetna Life Ins. Co.*, No. CV14-03932 BRO (FFMx), 2015 WL 4511620, *12 (C.D.

27         Cal. July 24, 2015) ("Nevertheless, the Court finds Dr. Corrado's conclusions sounder than those

28         presented by the peer reviewers.  Many of the opinions rendered by these reviewers are

presented in conclusory fashion, making it unclear how they reached such starkly contrasting results from those of Dr. Corrado despite reviewing the same materials"); *Ondersma*, 2007 WL 4371422 at *5 ("Here, by contrast, the opinion offered by Dr. Dixit is not conclusory in nature. The basis for his opinion is disclosed. Specifically, he details particular symptoms from which plaintiff suffers, including symptoms he directly observed or found to exist as a result of his examinations; further, he identifies functional limitations typically resulting from such specified symptoms and explains why plaintiff's symptoms, in particular, would cause her to be so limited").

### 3.    Shaw's Doctors' Reports

63.    The administrative record contains the reports of Shaw's treating physicians, as well as those of LINA's reviewing physicians, Dr. Flippen and Dr. Harrop.

64.    Dr. Levy was the first physician to opine that Shaw could not work. He also treated Shaw for the longest period. As noted, the long treatment history lends some credibility to Dr. Levy's reports, but may also have resulted in assessments that were biased in her favor. Additionally, Dr. Levy specializes in internal medicine and family practice, not psychology or psychiatry.[79] While, as an internist, Dr. Levy undoubtedly has some experience seeing patients who suffer from depression and anxiety, a practitioner of internal medical is not in as good a position as a psychologist or psychiatrist to form the type of in-depth functional conclusions necessary to conclude that a mental condition is disabling. Additionally, while Dr. Levy placed Shaw on leave for an extended period of time, his records are cursory, and contain minimal documentation of the frequency or intensity of Shaw's symptoms.[80] The records supply little, if any, evidence – beyond Dr. Levy's word – that Shaw was unable to perform the duties of her regular occupation. Nor do his reports include any descriptive or objective information that would support such a finding. Given the potential for bias, Dr. Levy's assessment alone is not sufficient to support a finding of disability.

---

[79]AR 238.

[80]*Id.* at 43, 250-91.

65.    Shaw also saw Dr. Milton, a psychiatrist, for six months.  Dr. Milton's reports are entitled to some weight, as she is a specialist in the relevant field and treated Shaw for a sufficiently long period to have developed some familiarity with her condition.

66.    The GAF scores Dr. Milton reported offer a general assessment of the severity of Shaw's symptoms.  They range, however, across two GAF bands, one of which indicates severe impairment, and the other of which indicates only moderate impairment.[81]  See DSM-IV at 32. See also *Lacroix v. Barnhart*, 465 F.3d 881, 883 (8th Cir. 2006) ( a GAF score of 51 to 60 is "indicative of 'moderate symptoms' or 'moderate difficulty in social, occupational, or school functioning'"); *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (a GAF score between 41 and 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life").  Given that Dr. Milton recorded such varying scores over a limited five-week period in May and June 2012, they are not substantially probative of the fact that Shaw was disabled.  Because Dr. Milton's reports provide little information beyond the GAF scores that is helpful in determining Shaw's occupational capacity, and because the scores themselves reflect serious and moderate impairment almost simultaneously, the court cannot conclude that Dr. Milton's reports demonstrate by a preponderance of the evidence that Shaw was disabled. Furthermore, Dr. Milton did not treat Shaw long enough to opine concerning her condition throughout the period covered by the claim.

67.    The administrative record also contains the records of Dr. Eroshevich, a psychiatrist who treated Shaw for two months.  Although two months is a comparatively short period, Dr. Eroshevich saw Shaw twenty-six times; this was arguably sufficient for her to have gained an understanding of Shaw's condition beyond her self-reported symptoms.  Dr. Eroshevich's reports, moreover, are quite detailed when compared with those of Drs. Levy and Milton.  They also include relatively objective mental status examination reports. While the reports describe the symptoms of Shaw's mental illness, they indicate that the most relevant criteria in assessing Shaw's occupational and functional capacity were in normal ranges, e.g., global intellect,

---

[81]*Id.* at 1040-42.

1    judgment/abstract reasoning, immediate and delayed recall, and ability to concentrate.[82]

2    68.  Dr. Eroshevich's records also show that Shaw refused psychiatric medication, requested

3         alternative and holistic treatments, and was not motivated to comply fully with Dr. Eroshevich's

4         treatment plan.  For example, following Shaw's August 26, 2013 visit, Dr. Eroshevich noted that

5         she "did not follow through on our treatment plan" and had not yet participated in the cognitive

6         treatment recommended.[83]  Courts discredit a plaintiff's subjective belief that she is disabled if

7         she refuses treatment or is not diligent in following a treatment plan that could alleviate her

8         symptoms.  See *Mitchell v. Colvin*, No. EDCV 13-1831 FFM, 2015 WL 1487022, *11 (C.D. Cal.

9         Mar. 31, 2015) ("As the ALJ also noted, plaintiff twice left the hospital against medical advice,

10        was not taking medication for his depression or undergoing any mental health treatment, and

11        continued to drink despite having diabetes.  A factfinder may properly discount a plaintiff's

12        subjective claims by pointing to evidence of a lack of treatment"); *Johnson v. Colvin*, No.

13        5:13-CV-03967-RMW, 2015 WL 1501789, *15 (N.D. Cal. Mar. 31, 2015) (concluding that an

14        ALJ's adverse credibility determination was supported by substantial evidence where "plaintiff

15        went long periods without seeking treatment, and took no psychotropic medications until after

16        he filed a Request for Hearing.  Plaintiff saw Dr. Weber three times between December 14, 2009

17        and February 1, 2010, and on all three visits plaintiff asked Dr. Weber to hold off on prescribing

18        any medication telling her that he was likely to transfer to a different mental health program.

19        The record also contains evidence of many instances of medical noncompliance with medication

20        prescribed by Dr. Harris and failure to comply with Dr. Harris's directives to have his labs

21        drawn.  Although some of the instances of non-compliance may have been due to factors outside

22        of plaintiff's control (i.e., insurance problems), many of them were due to his own choice or

23        preference. . . .  Thus, while the ALJ did not make an explicit finding that plaintiff had failed to

24        assert a good reason for seeking treatment, the ALJ did find that his frequency of treatment was

25        inconsistent with the level of his complaints"); *Lee v. Colvin*, No. CV-12-00585-TUC-BPV,

26   _____

27        [82]*Id.* at 245-48.

28        [83]*Id.* at 240.

2013 WL 3871416, *7 (D. Ariz. July 26, 2013) ("Here, Plaintiff provides no reason for resisting treatment [for mental illness], and there is no medical evidence that Plaintiff's resistance was attributable to her mental impairment rather than her own personal preference. It was reasonable for the ALJ to conclude that the 'claimant's noncompliance does not support the alleged intensity and duration of her subjective complaints'"). See also *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) ("Our case law is clear that if a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated"); *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 634-35 (9th Cir. 2009) ("In addition to the absence of objective quantification of pain levels Dr. Brown and Dr. Sukhov also observed that: (1) Montour's pharmacy records indicate he was using limited and relatively mild pain medication; and (2) his medical records with Dr. Kengla suggest that he had not recently engaged in any pain treatment programs. These observations probably constitute sufficient 'objective' evidence to support their conclusion that Montour's pain does not rise to the level of disabling pain"); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" constitutes affirmative evidence that a social security beneficiary is malingering and her subjective claims of pain are not credible); *Williams v. Colvin*, No. 6:12-CV-00633-JO, 2013 WL 3965325, *3 (D. Or. July 31, 2013) ("With respect to obesity and spinal impairments, Williams has failed to lose weight, exercise, or undergo bariatric surgery in spite of doctors' recommendations. Williams also is regularly noncompliant with her diabetes, migraine, and depression medication. She does not utilize her sleep apnea C–PAP machine. Lastly, she has not sought regular counseling, again in spite of doctors' recommendations. While this evidence is not decisive as to Williams's credibility, the ALJ should consider non-compliance when making a credibility determination").

69.   Shaw's failure to comply with recommended treatment plans and her refusal to seek certain types of treatment do not preclude her from demonstrating that she was disabled and entitled to benefits. Rather, they are factors to weigh in assessing credibility, and carry more or less weight depending on her diagnosis and her reasons for failing to follow recommended treatments. See

27

1   *Orn*, 495 F.3d at 638 ("But in the case of impairments where the stimulus to seek relief is less

2   pronounced, and where medical treatment is very unlikely to be successful, the approach to

3   credibility makes little sense"); *Smolen*, 80 F.3d at 1284 ("Where a claimant provides evidence

4   of a good reason for not taking medication for her symptoms, her symptom testimony cannot be

5   rejected for not doing so"); *Purifoy v. United of Omaha Life Ins. Co.*, No. 12-CV-13330, 2013

6   WL 3936737,*7 (E.D. Mich. July 30, 2013) ("Defendant improperly discredited Plaintiff's

7   credibility concerning the description of her symptoms and pain. . . .  The record demonstrates

8   Plaintiff could not afford to treat with these medical providers because she had no health

9   insurance.  The record further shows that conservative treatment was unsuccessful in remedying

10  Plaintiff's symptoms").   Here, the record contains no evidence as to why Shaw refused

11  psychotropic medications.  Nor is there any particular explanation as to why she declined to

12  follow the treatment plan Dr. Eroshevich prescribed, beyond the statement that she "want[ed]

13  . . . referrals that she herself [sought] out."[84]

14  70.   In addition to Shaw's treating physicians, the record also contains the reports of Drs. Flippen and

15        Harrop; both men are psychiatrists and reviewing physicians for LINA.  Because they conducted

16        paper reviews, their opinions are entitled to less weight than those of the treating physicians.

17        Although Shaw contends that neither doctor considered her physical condition or the side effects

18        of the powerful psychiatric medicine she had been prescribed, this was due primarily to the fact

19        that the records they reviewed did not discuss negative effects from medications or reveal

20        serious physical impairments.

21  71.   Dr. Harrop's treatment of Shaw's GAF scores, however, suggests some bias, as he notes only

22        the highest GAF score (58) and does not comment on the lower scores that were reported (i.e.,

23        45, 48 and 55).

24  72.   Nonetheless, the central issue raised by both Dr. Flippen and Dr. Harrop is apparent on the face

25        of the treating physicians' reports: the reports simply do not provide sufficient information to

26        support Shaw's assertion that she was unable to perform the responsibilities of her regular

27

28  [84]*Id.* at 68, 240, 313.

1 occupation throughout the claim period.

2 73. In sum, the medical information in the administrative record is not sufficient to satisfy Shaw's

3 burden of showing by a preponderance of the evidence that she was unable to perform the

4 material duties of her regular occupation.  The medical evidence is conclusory and inadequate

5 to determine Shaw's occupational abilities.  Notably, even the doctors who placed Shaw on

6 leave did not clarify whether her symptoms prevented her from returning to the work

7 environment where the incident occurred or – as the plan requires – *any* location where she

8 could work as a legal assistant.[85]  Consequently, on *de novo* review, the court concludes that the

9 medical evidence in the record weighs in favor of a finding that LINA properly denied Shaw's

10 disability benefits claim.[86]

11    **4. Government Disability Benefits**

12 74. In addition to seeking disability benefits from LINA, Shaw submitted applications to the SSA

13 and the California Employment Development Department (EDD) for disability benefits.  The

14 SSA denied her claim; the EDD, however, awarded Shaw California State Disability Insurance

15 ("CASDI") benefits.  Shaw argues that her receipt of CASDI benefits supports a conclusion that

16 she was entitled to benefits under LINA's plan.

17 75. Although the standards used by various disability benefits programs to determine eligibility

18 vary, the fact that a claimant is found to be entitled to disability "benefits [under one program]

19 . . . suggests that [she] suffers from some limitation on [her] ability to work." *Mossler v. Aetna*

20 *Life Ins. Co.*, No. CV 13-01945 SJO (MRWx), 2014 WL 3587511, *16 (C.D. Cal. July 21,

21 2014).

22 76. Thus, the fact that a claimant has qualified for government disability benefits is properly taken

23 into consideration as evidence of disability, but is not determinative. *Id.* at *16 ("Although the

24 disability standards used by the SSA and the Policy are different, Plaintiff's entitlement to SSD

26 [85]See, e.g., AR 240-44; 285; 291.

27 [86]Shaw also saw Karen Bryan, a therapist, and Sandy Gartin, an EDMR therapist.  However,
28 because their records were not included in the administrative record, the court cannot consider them.

29

benefits still suggests that he suffers from some limitation on his ability to work. Thus, 'although this award does not constitute direct proof, it reinforces [Plaintiff's] showing that [he] had a disability that could qualify [him] for benefits under [the Policy],'" quoting *Schramm*, 718 F.Supp.2d at 1164-65); *Rodas v. Standard Ins. Co.*, No. EDCV13-2203 JGB (SPx), 2015 WL 5156455, *7-8 (C.D. Cal. Sept. 1, 2015) ("While the de novo standard of review applies in this case, the Court must take into account the 'weighty evidence' that the SSA found that Plaintiff was disabled," citing *Salomaa*, 642 F.3d at 679). Here, Shaw was denied SSA benefits, but awarded CADSI benefits.

77. The record contains no information as to the reasons Shaw's disability benefits application to SSA was denied. The Ninth Circuit has warned that "in some cases, such as this one, the SSA deploys a more stringent standard for determining disability than does the governing ERISA plan." *Montour*, 588 F.3d at 635-36. Specifically, to receive Social Security disability benefits, Shaw had to show that she was "unab[le] to engage in any substantial gainful activity by reason of a[ ] medically determinable physical or mental impairment . . . which ha[d] lasted or [was] expected to last for [at least] 12 months." 42 U.S.C. §§ 423(d)(1)(A), (d)(5)(A). Under the Plan, however, Shaw had merely to show that she was unable to perform the material duties of her regular occupation. While the standards used by the SSA to assess disability differ from those set forth in the policy, the fact that benefits were denied can be said to lend some minimal support to LINA's ultimate resolution of the claim. At a minimum, it undermines the conclusion that Shaw suffered from the global dysfunction described in her narrative letter and in the supporting documents written by her family and friends.

78. Shaw was awarded CASDI benefits based not only on the opinions of her treating physicians, but on the reports of three independent medical examiners. The definition of "disabled" used in determining eligibility for CASDI benefits is similar to that found in the Plan. CAL. UNEMP. INS. CODE § 2626 ("An individual shall be deemed disabled on any day in which, because of his or her physical or mental condition, he or she is unable to perform his or her regular or customary work"). While this weighs in favor of a finding of disability, it is, as noted, not determinative. The administrative record does not contain the reports of the three independent

30

1    medical examiners; as a consequence, the court cannot determine whether their findings

2    suggest Shaw is qualified to received disability benefits under the Plan.  See *Montour*, 588 F.3d

3    at 636 ("Unfortunately, the administrative record in this case only contains the SSA's award

4    letters without the opinion by the SSA administrative law judge (ALJ) or the SSA administrative

5    record on which that decision was based.  This omission makes the process of comparing and

6    contrasting the two opposing disability determinations more difficult").  Because the bases for

7    the state's CASDI determination is not apparent from the administrative record, the court

8    concludes that it is not sufficient to overcome the weight of contrary evidence concerning

9    disability that is in the record.

10            **5.      Other Evidence Offered to Establish Disability**

11   79.   The administrative record contains several other pieces of evidence that the parties cite to prove

12         or disprove Shaw's entitlement to disability benefits; none, however, is ultimately persuasive.

13            **(a)      Narratives Written by Shaw, her Friends and Family**

14   80.   In addition to medical records, Shaw included with her appeal a narrative statement concerning

15         her symptoms as well as letters from her family and friends.  These letters paint a more dramatic

16         picture of Shaw's condition than the medical records, and describe the impact Shaw's mental

17         illness has had on her personality and lifestyle.  While the court does not doubt that Shaw

18         struggles with symptoms of her condition, ultimately it cannot rely on these narratives to find

19         that Shaw is entitled to disability benefits.

20   81.   First, because they are written by Shaw, her family and friends, the narratives present a

21         significant potential for bias.  Second, the descriptions in the narratives indicate that Shaw's

22         condition is far more severe than the reports of Dr. Milton and Dr. Eroshevich, suggesting either

23         that the descriptions are exaggerated or that, while Shaw did not feel the need to compose herself

24         when with her family and friends, she could do so when required to interact with those outside

25         her immediate circle of close acquaintances.  The work environment, of course, more closely

26         resembles interaction with a physician than it does interaction with family and close friends.

27         Third, it is notable that despite the conditions described in the narratives, Shaw saw a

28         psychiatrist for only eleven months of the two-year claim period, was inconsistent in complying

                                                    31

1   with her treatment plan, and sought alternative therapies instead of intensive traditional

2   treatment strategies.

3   82.   Finally, Shaw, her friends, and her family, are not only not medical specialists, they also are not

4   care providers.  Given that courts discount the opinions of doctors outside the area of their

5   specialty, the reports from individuals with no medical background cannot overcome medical

6   evidence and should receive even less weight.  In practical terms, while Shaw's friends and

7   family have been able to observe her lifestyle and mood at home, they cannot diagnose her

8   medical condition or assess her functional capacity in the way individuals trained in the medical

9   field can.  For these reasons, the narratives written by Shaw, her family and friends do not

10   compensate for the fact that there is insufficient medical evidence of functional disability in the

11   record. See, e.g., *Bloom v. Hartford Life and Accident Ins. Co.*, 917 F.Supp.2d 1269, 1285 (S.D.

12   Fla. 2013) ("Even though Bloom's family and friends wrote letters testifying as to her seizures

13   and inhibited cognitive function, a diagnostic examination and file review performed by

14   Hartford's independent doctors found no clinical evidence to support those claims"); see also

15   *Brigham v. Sun Life of Canada*, 183 F.Supp.2d 427, 438 (D. Mass. 2002) (noting that affidavits

16   from the claimant's family and friends that he could not perform routine tasks, needed assistance

17   with daily living, and was severely and totally disabled were entitled to less weight than medical

18   evidence in the record and did not show that the benefits decision was unreasonable).

19   **(b)   Shaw's Behavior in Pursuing her Claim**

20   83.   LINA asserts that the fact Shaw diligently pursued her disability claim and appeal shows that

21   she has the ability to write, reason, remember, work to meet deadlines, and communicate and

22   coordinate with others.  It contends that a person suffering from disabling PTSD, depression,

23   and/or anxiety could not have accomplished these tasks.  Alternatively, it argues that Shaw's

24   submissions show she could have worked as a legal assistant during the claim period despite her

25   diagnosis.  This argument fails for two reasons.

26   84.   First, constructing an appeal letter and working a full work week are not functionally equivalent:

27   the first permits one to start and stop as the severity of symptoms increases and decreases; the

28   second requires relatively consistent functioning during designated hours every day.  See

1    *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that

2    the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract

3    from her credibility as to her overall disability.  One does not need to be 'utterly incapacitated'

4    in order to be disabled"); *Fair*, 885 F.2d at 603 ("The Social Security Act does not require that

5    claimants be utterly incapacitated to be eligible for benefits, and many home activities are not

6    easily transferable to what may be the more grueling environment of the workplace, where it

7    might be impossible to periodically rest or take medication" (internal citations omitted)).  See

8    also *Williams*, 2013 WL 5519525 at *12 ("Having found that Williams suffers from

9    fibromyalgia, rheumatoid arthritis and other conditions that cause chronic pain, and because of

10   the subjective, chronic nature of fibromyalgia, and the existence of good days and bad days, the

11   court must examine the record to determine the overall pattern of her illness and resulting pain,

12   not only on her abilities on a particular day, but on her employability"); *Hanusik v. Hartford Life*

13   *Ins. Co.*, No. 06-11258, 2008 WL 283714, *4 (E.D. Mich. Jan. 31, 2008) ("Dr. Slain indicated

14   that Plaintiff was unable to do all of those activities on the same day for a continuous period of

15   eight or four hours. . . .  [T]he video surveillance fails to show Plaintiff either performing any

16   single or combination of activities for an eight or four hour period, or strenuously exerting

17   herself over the course of two consecutive days").  But see *Orn*, 495 F.3d at 639 ("daily

18   activities may be grounds for an adverse credibility finding if a claimant is able to spend a

19   substantial part of his day engaged in pursuits involving the performance of physical functions

20   that are transferable to a work setting")

21   85.   Second, although the court is conducting a *de novo* review, because LINA failed to reference

22         the manner in which Shaw pursued her claim and appeal as a justification for denying disability

23         benefits, it is foreclosed from asserting the argument now.  *Carrier*, 2015 WL 4511620 at *14

24         ("Because this was not the basis for Defendant's termination of Plaintiff's benefits, however, it

25         would not be a proper basis on which to uphold Defendant's decision"); *Upadhyay v. Aetna Life*

26         *Ins. Co.*, No. C 13–1368 SI, 2014 WL 186709, *2 (N.D. Cal. Jan. 16, 2014) (noting that under

27         either *de novo* or abuse of discretion review of a benefits denial, the plan cannot raise additional

28         reasons supporting the denial because they were not raised during the administrative process);

see also *Jebian*, 349 F.3d at 1104-05 ("[A] contrary rule would allow claimants, who are entitled to sue once a claim had been 'deemed denied,' to be 'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced. Our refusal to subject claimants to that eventuality parallels the general rule that an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself, not a subsequent rationale articulated by counsel" (internal quotation marks and citation omitted)).

86. As a result, Shaw's diligent pursuit of her claim and appeal does not support a finding that she was not disabled under the terms of the Plan.

### (c)   Procedural Irregularities

87. Each party cites procedural irregularities by the other that influenced the benefits decision. These irregularities are not relevant on *de novo* review.

88. LINA cites the fact that certain of Shaw's medical providers did not submit their records for its review. Shaw elected to withhold records from two of her health care providers – Karen Bryan, MFT,[87] and Sandi Gartin, an EDMR therapist[88]– that might have provided more support for, or undermined, her disability claim. Shaw also advised LINA that her physician had administered the Minnesota Multiphasic Personality Inventory ("MMPI") – a test LINA sought.[89] She did not provide the test results to LINA, however. In conducting its review, the court cannot speculate as to the contents of these records. Even if they would have supported Shaw's disability claim, it was her burden to provide the records to LINA.[90]

---

[87]AR at 94.

[88]*Id.* at 101.

[89]*Id.* at 706-07.

[90]In *Montour*, the court noted that "[a]lthough the Plan place[d] the burden on Montour to submit 'written proof' of his disability . . . regulations promulgated by the Secretary of Labor authorize, if not require, plan administrators working with an apparently deficient administrative record to inform claimants of the deficiency and to provide them with an opportunity to resolve the problem by furnishing information." *Montour*, 588 F.3d at 636 (citing 29 C.F.R. § 2560.503-1 (g)(1) ("[T]he plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. . . . The notification shall set forth, in a manner calculated to be understood by the

89. Shaw argues that LINA mishandled her claim because it did not have her undergo an independent medical examination. This is not relevant on *de novo* review. See *Hoffman*, 2014 WL 7525482 at *6 ("Plaintiff makes numerous and wide-ranging arguments alleging improprieties and procedural mistakes by Defendants [including failure to have plaintiff undergo an independent medical examination]. These would be more relevant if the Court were conducting an abuse of discretion analysis. However, as the Court is conducting a de novo review, the focus is on the adequacy of Plaintiff's evidence to support his disability").

90. Shaw also asserts that LINA failed to engage in meaningful dialogue during the processing of her claim. This too is irrelevant on *de novo* review. See *Carrier*, 2015 WL 4511620 at *14 ("Defendant argues that the Court should afford its decision deference because Defendant engaged in a good-faith exchange of information with Plaintiff. . . . But the parties both agree that de novo review applies here, which reduces the Court's role simply "to evaluat[ing] whether the plan administrator correctly or incorrectly denied benefits, without reference to [a procedural

---

claimant – A description of any material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary")). The *Montour* court considered the plan administrator's failure to do so relevant, however, in assessing procedural unreasonableness, conflict on interest, and how much weight to give its decision on abuse of discretion review. In the context of *de novo* review, which is what the court performs here, procedural unreasonableness and/or conflict are relevant only in determining whether extra-record evidence should be admitted. See *Liyan He v. Cigna Life Ins. Co. of New York*, 304 F.R.D. 186, 188 (S.D.N.Y. 2015) ("That being said, the existence of a conflict of interest and procedural irregularities still has some relevance in a case involving *de novo* review. This is because the Second Circuit has held that a district court may consider evidence outside of the administrative record on its merits review only where 'good cause' is shown, and that such 'good cause' is evaluated based on whether there is a conflict of interest and procedural irregularities," citing *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006); *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 294-96 (2d Cir. 2004)); *Gonda v. Permanente Med. Group, Inc.*, 300 F.R.D. 609, 616 (N.D. Cal. 2014) ("As discussed in section III.B., insurer conflicts may be relevant to whether the Court should consider evidence outside the administrative record as part of its *de novo* review. However, since Defendants' claims decision is not entitled to any deference, such conflicts are irrelevant with respect to the Court's consideration of the merits. The pertinent inquiry is whether the denial of benefits was proper"); see also *Micha v. Sun Life Assur. Co. of Canada*, 789 F.Supp.2d 1248, 1257-63 (S.D. Cal. 2011) (concluding that it was appropriate to consider extra-record evidence in reviewing a claim denial *de novo* because, among other problems with the denial letter and appeal, the denial letter did not describe additional material or information that it would be necessary for the claimant to submit perfect the claim, as required by 29 C.F.R. § 2560.503-1(g)(1)). Shaw did not ask the court to consider Bryan's or Gartin's record in conducting a *de novo* review.

1    irregularity such as] whether the administrator operated under a conflict of interest,'" quoting

2    *Abatie*, 458 F.3d at 963, 972)

### 6.    Conclusion Regarding Shaw's Evidence of Disability

91.   In sum, the medical reports in the administrative record are not sufficient to show by a
preponderance of the evidence that Shaw was unable to perform the material duties of her
regular occupation.  The only reports that support her claim are conclusory, and provide
insufficient information concerning Shaw's functional capacity.  The fact that Shaw was denied
federal disability benefits, but received disability benefits from the state of California, is
non-conclusive, particularly given the lack of evidence in the record that details the rationale for
the two decisions or whether those rationales might have informed a decision as to whether she
was disabled under the Plan.  Finally, although the narratives provided by Shaw, her family, and
friends suggest that her mental illness was disabling, the court ultimately cannot place great
weight on this evidence, given its potential for bias, the fact that it is inconsistent with the
severity of symptoms noted in the doctors' reports, and the manner in which Shaw pursued (or
did not pursue) treatment.  It must also be discounted because the individuals writing the
narratives do not have expertise in psychiatry or medicine.

92.   Even where a plan "does not require a claimant to provide objective evidence of disability,
subjective evidence of a disabling condition is inherently less reliable than objective evidence.
Of course, the court is conscious that psychological disorders may not always be objectively
verifiable.  However, where, as here, self-reported symptoms are contradicted by testing
showing [plaintiff] to be 'within normal limits across all cognitive domains,' the court finds the
more objective evidence to be more convincing."  *Langlois v. Metropolitan Life Ins. Co.*, No.
11-cv-03472, 2012 WL 1910020, *14 (N.D. Cal. May 24, 2012).  For these reasons, the court
finds that Shaw has not met her burden of proving both her diagnoses and her inability to
perform the material duties of her regular occupation by a preponderance of the evidence.

### D.    Whether Plaintiff Is Entitled to a Penalty for LINA's Failure to Provide Her with a Copy of the Administrative Record

93.   In addition to her claim for benefits, Shaw alleges that she is entitled to penalties under 29

1  U.S.C. § 1132(c)(1)(B) because LINA failed to provide a copy of the administrative record in

2  a timely fashion despite multiple requests.

3  94.  Section 1132(c)(1) states: "Any administrator 'who fails or refuses to comply with a request for

4  any information which such administrator is required by this subchapter to furnish to a

5  participant or beneficiary' may in the court's discretion be personally liable to such participant

6  or beneficiary in the amount of up to $100 a day.'"  ERISA defines "[a]dministrator" as "the

7  person specifically so designated by the terms of the instrument under which the plan is

8  operated."  29 U.S.C. § 1002(16)(A).

9  95.  The Ninth Circuit has held that only the plan administrator can be sued for failing to provide

10  documents pursuant to § 1132(c)(1)(B).  *Rodriguez v. Reliance Standard Ins. Co.*, No. C

11  03-04189 CRB, 2004 WL 2002438, *1 (N.D. Cal. Sept. 8, 2004) (citing *Moran v. AETNA Life*

12  *Ins. Co.*, 872 F.2d 296, 298-99 (9th Cir. 1989)); see also *Younkin v. Prudential Ins. Co. of Am.*,

13  288 Fed. Appx. 344, 346 (9th Cir. July 23, 2008) (Unpub. Disp.) ("Here, the ERISA plan at issue

14  named Washington Corporations – not Prudential – as the 'plan administrator.'  The fact that

15  Prudential makes benefit determinations does not change this analysis"); *Gravelle v. Health Net*

16  *Life Ins. Co.*, No. C 08-04653 MHP, 2009 WL 210450, *10 (N.D. Cal. Jan. 26, 2009) ("Only an

17  entity designated by the statute as an administrator can be held liable for failure to provide plan

18  documents").  The Ninth Circuit takes a strict textual, rather than functional, approach in

19  determining the identity of the plan administrator.  *Rodriguez*, 2004 WL 2002438 at *1

20  (rejecting an argument that an entity that acted like the administrator was *de facto* the plan

21  administrator because it did not satisfy the statutory definition).

22  96.  According to the terms of the Plan, the plan administrator is "Colony Advisors, LLC and U.S.

23  Affiliates," not LINA.[91]  Shaw is therefore not entitled to penalties under § 1132(c)(1).  See

24  *Levesque v. Kemper Nat. Services, Inc.*, Civil Action No. 04-4143, 2006 WL 1686624, *1 (E.D.

25  Pa. June 14, 2006) (concluding that an insurer could not be held liable for failure to provide the

26  claims file to a claimant because it was not the plan administrator).

27  ───────────────

28  [91]*Id.* at 1232, 1266.

37

1

2                                    **III. CONCLUSION**

3          Based on the findings of fact and conclusions of law set forth above, the court concludes that

4    LINA is entitled to have judgment entered in its favor.[92]

5

6    DATED: November 4, 2015

7                                                    MARGARET M. MORROW
                                                     UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27          [92]Because it concludes that LINA should prevail on the merits, the court need not address

28   LINA's arguments regarding the calculation of benefits.